**In re Philip R. MISSIRLIAN, Debtor.**

**Carlos A. ROMERO, M.D. Plaintiff,**

**v.**

**Philip R. MISSIRLIAN, Defendant.**

Bankruptcy No. 189–91933–260.
Adv. No. 189–0135–260.

United States Bankruptcy Court, E.D. New York.

April 24, 1990.

Edward Zinker, Smithtown, N.Y., for debtor.

Anthony J. Falanga, Carle Place, N.Y., for plaintiff.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

The plaintiff (hereinafter "Dr. Romero") initiated this adversary proceeding against the debtor, wherein he seeks to have his claim of $4,715 for services rendered the debtor's mother, Mary Missirlian, to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and 11 U.S.C. § 523(a)(4). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). For the reasons hereinafter set forth the complaint is dismissed.

## FACTS

In the early part of April of 1988 Dr. Romero rendered professional services to Mary Missirlian. Thereafter and unbeknownst to Dr. Romero, Mary Missirlian died on April 13, 1988. Without knowledge of her death, Dr. Romero's office mailed an itemized bill to her on April 19, 1988. On April 21, 1988 a Medicare claim form was submitted by Dr. Romero's office to Blue Cross/Blue Shield ("Blue Cross" or "the carrier") for Medicare benefits on behalf of the patient, indicating a total bill of $4,485.[1] As reflected in the form, Dr. Romero chose not to accept assignment to him of her claim. A check dated April 28, 1988 in the amount of $2,178.44 representing Medicare benefits under the claim was issued by Blue Cross and mailed to Mrs. Missirlian. The debtor received the check among his mother's mail and returned it to Blue Cross because only she could cash it.

A second check was issued by Blue Cross on June 1, 1988 for the same amount, $2,178.44, payable to the order of "Philip R. Missirlian for Mary Missirlian". The debtor cashed the check and spent the proceeds. Approximately one year later, on June 12,

---

1. The amount said to be due and owing to Dr. Romero has varied in various transmittals and court documents. Since no proof of claim has been filed by Dr. Romero in this case and the debtor lists the alleged debt in his schedules in an unknown amount, this court will recognize the amount listed in the sworn adversary complaint until shown otherwise. The differences are not significant.

1989, he filed the within Chapter 7 case. The debtor listed Dr. Romero as a disputed creditor for an unknown amount in his schedules accompanying the petition.

At least one attempt was made by Dr. Romero to collect from the debtor his bill for services rendered to Mrs. Missirlian as evidenced by a statement dated December 20, 1988 requesting that the debtor forward to him any Medicare payments received.

Dr. Romero argues that the proceeds of the check for $2,178.44 was paid to and received by the debtor in trust for Dr. Romero and which the debtor converted to his own use.

## DISCUSSION

Medicare is a Federal health insurance program for individuals 65 and older and for certain disabled people. Authorized in 1966 by Title XVIII of the Social Security Act and incorporated in 42 U.S.C.A. § 1395, Medicare has two parts. Part A consists of hospital insurance and provides payment for inpatient hospital care, skilled nursing facility care, skilled home health care and hospital care. A person entitled to Medicare automatically receives this coverage. Part B, on the other hand, is medical insurance which covers physician's services, outpatient hospital services and other medical services and supplies. Part B is optional and beneficiaries desiring these benefits must pay a monthly premium. The services rendered by Dr. Romero were provided under Part B of the Act.

In the administration of the Medicare Program, Blue Cross acts purely as a fiscal intermediary. When the Secretary of Health and Human Services (previously Secretary of Health, Education and Welfare), has contracted with a private insurer to administer the provisions of the Medicare Act, the private insurer becomes an agent of the United States which is the real party in interest in any suit based on such administration of a Medicare claim. *Le-Compte v. Aetna Insurance–Medicare Claims*, 397 F.Supp. 415 (Okl.1975). For this reason, any references to actions by Blue Cross will necessarily imply that the actions were taken as agents of the United States.

Under the provisions of Part B, payment by Medicare may be made directly to the individual for certain covered services furnished by physicians and other suppliers. On the other hand, in some cases, an individual has a right to assign to the physician or supplier who furnished the services, the payment he would otherwise receive directly. MEDICARE & MEDICAID GUIDE (CCH) para. 11,101. For practical purposes, it is usually the physician who decides whether he will accept assignment of Medicare claims.

The terms of the assignment are that the enrollee (patient) transfers to the physician his rights to benefits on the assigned claim and the physician agrees to accept the "reasonable" charge determined by the carrier as his *full charge* for the items or services. Once the physician accepts assignment any attempt to collect additional payments from the enrollee would be considered a violation of the assignment. MEDICARE & MEDICAID GUIDE (CCH) para. 5350.

In the case at bar, Dr. Romero opted not to take the assignment of the Medicare claim. As has already been noted, without knowledge of her death on April 13, Dr. Romero mailed an itemized bill to the patient on April 19, and subsequently filed the claim with Blue Cross on April 21 in her stead.

In the unfortunate situation when the patient dies prior to settlement of its claim with Medicare, there are several procedures in the Act which the carrier must follow in order to ensure that the proper party be paid. If the physician has already been paid for his services, 42 U.S.C.A. § 1395gg(e) provides that the amount due from Medicare be paid to the person other than the deceased individual who paid for such medical services. If the payment to the provider was made by the patient before death, the Medicare payment shall be made to the legal representative of the estate. If neither of these happenings exist, payment shall be made in the priority

of survivorship as designated in the statute.

As in the initial case, where payment has not yet been tendered to the physician prior to the enrollee's death, 42 U.S.C. § 1395gg(f) provides:

*Settlement of claims for section 1395k benefits on behalf of deceased individuals*

If an individual who received medical and other health services for which payment may be made under section 1395k(a)(1) of this title dies, and no assignment of the right to payment for such services was made by such individual before his death, and payment for such services has not been made—

(1) if the person or persons who furnished the services agree to the terms of assignment specified in section 1395u(b)(3)(B)(ii) of this title with respect to the services, payment for such services shall be made to each person or persons, and

(2) if the person or persons who furnished the services do not agree to the terms of assignment specified in section 1395u(b)(3)(B)(ii) of this title with respect to the services, payment for such services shall be made on the basis of an itemized bill to the person who has agreed to assume the legal obligation to make payment for such services and files a request for payment (with such accompanying evidence of such legal obligation as may be required in regulations),

but only in such amount and subject to such conditions as would be applicable if the individual who received the services had not died.

The mechanism for carrying out this section is found in the Medicare Carriers Manual § 7201. It provides in part that in order for a third party to claim benefits for services furnished a deceased beneficiary, the claimant must submit the following documents:

—A signed statement which reads as follows:

"I have assumed the legal obligation to pay (name of physician or supplier) for services furnished (name of deceased beneficiary) on (date(s)). I hereby claim any Medicare benefits due for those services."

—A completed HCFA–1490S which the claimant has signed in the space provided for the signature of the patient,

—A statement signed by the physician, e.g., on the form HFCA–1500, which signifies the physician's refusal to accept assignments, and

—An itemized bill addressed to the individual claiming the underpayment or which otherwise identifies that individual as the person to whom the physician looks for payment. If the claimant is the legal representative of the estate, a bill addressed to the estate or a bill addressed to the beneficiary with indication that the beneficiary is dead, satisfies this requirement.

The signed statement by the physician is needed because under § 1395gg(f) payment may be made to a person who agrees to accept the legal obligation to pay for the services *only* if the physician does not agree to accept the reasonable charge as the full charge. If the physician agrees to these terms and files a claim, payment will be made to the physician. There is nothing in the record to show that Dr. Romero was ever offered the opportunity to accept the "reasonable" amount after the death of the patient but before the second check was issued to the debtor. Maurice Lipari, Manager of Medicare Part B at Blue Cross, testified that in situations such as this, a letter is sent the provider of the services, informing him that the beneficiary was deceased and asking him whether or not he would agree to accept assignment of the claim.

■ When the first check was issued, the file at Blue Cross indicated that Dr. Romero would not accept an assignment. This is not in dispute. As for the second payment which was made at a time when Blue Cross knew of the death, there is confusion as to why no letter was sent to Dr. Romero with regard to whether he

would accept the "reasonable" amount of the services from Blue Cross in full satisfaction of his claim. In any event, there is no evidence that such letter was sent.

There has been no evidence or testimony which would indicate that the debtor had assumed the legal obligation to pay Dr. Romero, although a statement to that effect should presumably have been required in order to claim the funds from Blue Cross. In fact Joan Romero, the physician's wife, office manager and nurse, testified that at no time did the debtor indicate that he would be responsible for the patient's expenses. It was Dr. Romero, himself, who decided from the onset not to take an assignment of the claim which would have enabled him to be paid directly from Blue Cross. The physician is not a stranger to Medicare. On the contrary, he is the crucial actor in the three-way relationship between the patient and Medicare. *Szekely, M.D. v. Florida Medical Association*, 517 F.2d 345, 348 (5th Cir.1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

In no way does this Court condone the actions of the debtor. Equity would seem to demand that the doctor be redressed for the debtor's wrongdoing. However, the issue of standing precludes such a finding.

Dr. Romero's injury cannot be directly traced to the defendant's conduct, *St. Paul Fire and Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 696 (2nd Cir.1989), nor can he demonstrate a sufficient interest to create a "case or controversy" required to confer standing in this case. *U.S. v. Premises and Real Property at 4492 South Livonia Rd., Livonia, N.Y.*, 889 F.2d 1258 (2d Cir. 1989). The physician voluntarily made a decision not to take an assignment of the Medicare claim. Dr. Romero's wife and office manager testified that an assignment was not accepted because the claim would be "limited" and Medicare "wouldn't pay [the debtor] in full." The doctor made a financial decision and sadly must now bear the risk. He chose to be paid by the patient who is now deceased. His action is against the decedent's estate, and unless evidence can prove the debtor accepted the monies from Medicare in trust for his deceased mother, or that the debtor agreed to assume the expense, the action is not against the debtor.

In the absence of a sufficient showing to the contrary, this Court finds that Dr. Romero is not a creditor of the debtor and suggests that the doctor's recourse remains against the estate of Mary Missirlian and against Blue Cross for failing to follow the proper procedures in disbursing funds.[2] Accordingly he would share *pari passu* with such other creditors of the decedent's estate, if one exists. Therefore, since we find that Dr. Romero is not a creditor of the debtor herein, the issue as to whether the debt should be discharged is moot.

■■■■ Aside from our conclusion that the plaintiff lacks standing to bring this action, we find that the plaintiff's argument that the debt should be deemed nondischargeable because the monies received by Medicare were trust funds paid to the debtor in a fiduciary capacity, would fail under § 523(a)(4) of the Bankruptcy Code. There is a long-standing principle emanating from the Supreme Court that in determining dischargeability in bankruptcy, fiduciary responsibility arises only from technical trusts, not from trusts implied in law. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (Cardozo J.). Technical trusts are defined as express trusts which are created by the parties with the intent of imposing a trust relationship. *In re Levitan*, 46 B.R. 380 (Bankr.E.D.N.Y.1985). The debtor must serve as technical trustee prior to and independent of the debt incurred by fraud or defalcation. *In re Stone*, 94 B.R. 298, 302 (S.D.N.Y.1988); *In re Thorsen and Co.*, 98 B.R. 527 (Bankr.Colo.1989). "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a

---

**2.** This Court makes no specific finding as to the liability of Blue Cross in this action. Nor does this Court impinge upon the jurisdiction of any administrative courts which may have exclusive jurisdiction to hear such matters.

trustee before the wrong and without reference thereto." *Davis v. Aetna* 293 U.S. at 333, 55 S.Ct. at 153.

In *In re Catalano*, 98 B.R. 168 (Bankr. W.D.N.Y.1989), payment received from an insurance carrier based on a claim for medical services did not give rise to a "fiduciary relationship" within the meaning of exception to discharge. This result followed even though the hospital admission form included an assignment to the hospital of any insurance proceeds received. *Catalano*, 98 B.R. at 169. As in *Catalano*, there is no evidence here to support the existence of a trust in favor of Dr. Romero.

■ The plaintiff has also failed to make out a *prima facie* case of actual fraud or any false pretense or misrepresentation made by the debtor which would require a finding of nondischargeability under § 523(a)(2) of the Code.

Based on the foregoing, judgment must reluctantly be entered in favor of the defendant.

Submit proposed Judgment in conformity with this opinion.